## PATRICK O'REILLY vs. BOWKER FERTILIZER COMPANY.

Suffolk.   January 10, 1899. — September 7, 1899.

Present: HOLMES, C. J., KNOWLTON, MORTON, LATHROP, BARKER, & HAMMOND, JJ.

*Personal Injuries — Master and Servant — Negligence — Action.*

A. had been employed for three years in a factory where fertilizer was manufactured. An elevator, the machinery of which consisted of an endless chain of buckets, ran from the bottom to the top floor, and was completely boxed in. On the ground floor there was an opening in the box, and through this hole A. fed into the buckets the material, which was ground to the consistency of flour or meal and was inflammable. On a certain occasion the buckets had become clogged, and A. was engaged in digging away the material so as to allow the elevator to run. The pile of material was five or six feet high. A. was working on one side, having a lantern between his feet, and his employer's superintendent was on the other side about eight feet off. The superintendent ordered the machinery to be started, an explosion followed, and A. was injured. *Held,* that there was no evidence that the product was known to be inflammable before the accident showed it to be so, or that the superintendent knew that the lantern was between A.'s feet, and that A. therefore could not maintain an action for his injury under the employers' liability act, St. 1887, c. 270, § 1, cl. 2, on the ground of the superintendent's negligence.

TORT, under the employers' liability act, St. 1887, c. 270, § 1, cl. 2, for personal injuries, alleged to have been caused by the negligence of the defendant's superintendent. Trial in the Superior Court, before *Blodgett*, J., who allowed a bill of exceptions, in substance as follows.

It appeared that the defendant operated a factory in Brighton for the purpose of making fertilizer and animal meal, so called. These products are made from bone, rock, and refuse from the slaughter houses. During the process of manufacture the material, after having been in part ground to the consistency of flour or meal, and mixed in certain proportions, is taken from the ground floor of the building to the top floor, by means of a chain and bucket elevator. This elevator consisted of an endless chain about four inches wide, to which were affixed at intervals of about three feet iron buckets which were about twelve inches long, five inches across the top, and five inches deep. This chain passed over a drum on the top floor, and under a drum set just under the ground floor. It was operated by a shaft on the top floor, which was moved by the usual and common arrangement of a belt with loose and tight pulleys, and a shipping-rod or handle by means of which the belt was thrown from one pulley to the other, all of which apparatus for operating and controlling the elevator was on the top floor. There was a bell on the top floor connected with the ground floor, by which signals were given from the ground to the top floor, two bells being the signal for starting and one bell for stopping, and there was also a bell on the ground floor by which signals could be given from the top floor when, for any reason, those at work at the top wished to have the supply of material on the elevator cease.

The elevator itself passed from the bottom to the top floors through the intermediate floors in an almost vertical direction, and throughout the whole distance it was enclosed in a box or well about four feet long by two feet and a half wide. On the ground floor was an opening in the elevator box or well near the floor, provided with a vertical slide controlled by a short handle or lever. The material, after being mixed, was piled against the elevator well, and by means of this hole and slide was allowed to run into the well and be caught by the buckets of the.

elevator and carried up. When the elevator was being used a man was put at the pile of material to feed it and control the flow from the pile into the well, so that too much would not get in. It was a frequent occurrence for the material to clog about the elevator chain and buckets and drum and to stop the elevator, and in such cases the belt, by the stopping, would be thrown off the pulleys on the top floor, and would hang on the shafting, and it would be necessary to dig out the accumulated material from the pit about the drum at the bottom of the elevator, so as to free the buckets and chain. In order to do this more easily the section of the front of the elevator box in which was the slide could be taken off, and a similar portion on the back could also be taken off, so that the elevator box for its whole width and for a height of about four feet could be opened in front and behind.

The material being fed into the elevator was like a fine powder or dust which covered the premises and machinery, and was inflammable.

The plaintiff testified that on January 9, 1896, between one and two o'clock in the afternoon, he was sent to feed this elevator; and that after doing so for about half an hour the elevator got clogged and stopped, and he had to take off the front of the elevator box and dig out the material, and as he was getting this off, one Sparrow, the defendant's superintendent, came down and asked him what the trouble was; and further testified as follows: " I told him the elevator was stopped; I got no bell and did n't rightly know the cause. I don't know whether he stayed there or whether he went away. I continued to dig her out, and in a short time after he came along there and asked me, ' Did you try the mill ?' I said ' No.' I rose up to go and give the bell, as it was my usual custom. I saw a man standing in the direction of the bell, and I stooped down again, and at that time I heard the rattle of the buckets or chain, so I saw they were after trying the mill, and she would n't go; I knew she could n't. As soon as it stopped still I commenced to shovel again. I could n't have been a second or two shovelling when the foreman came with a lantern around the corner of the mill, and he says, ' O'Reilly, take this lantern.' I took the lantern. I then cleaned a place with my toe, and stood the lantern right down

on the level of the floor between my legs; left it there and commenced to shovel again. I found the stuff stiff under the second bucket. I was shovelling with a short-handle shovel. From the level of the floor to the under bucket might be two feet, and this shovel caused me to stoop over like, and while I was in the act of clearing that bucket the elevator started. As the elevator started I heard somebody sing out, ' Look out, there! ' and the flash of fire and flame came around me the same. I knew no more. I lost the shovel. Either the lantern or the oil, I can't account for which, struck me in the face," and he received the injuries complained of. His evidence showed that the pile of material was five or six feet high.

On cross-examination, he testified that at the time of the accident he had been in the employ of the defendant over three years, principally working on this elevator; that the clogging of the elevator was a very common thing; that it would be rare to have it run without getting clogged, and when it got clogged he had to clear it out, just as he was doing at the time of the accident; that when there wasn't enough daylight he needed a lantern, and for convenience of using a lantern he had some time before driven a nail high enough so he could work comfortably under it without accident; that just before the explosion there was nothing to indicate that the machinery was moving or about to move; and that the machinery when in motion made a strong current of air about it.

Timothy J. Lyons, a witness called by the plaintiff, testified that he was at work on the second floor when the elevator stopped; that he was told to go to the top floor and help put on the belt; that he did so, and then went down where the plaintiff was digging out, and was followed at once by Sparrow, the superintendent; that they stood together watching the plaintiff digging out; that the superintendent told him to give two bells to the man on the top floor to start the elevator, and he did so, and the elevator did not start; that a few moments later, after the plaintiff had dug out again, he told him to give two more bells, and he did so, but the elevator did not start; that, a few moments after, the superintendent again gave him orders to give two bells, which he did, and the explosion followed.

On cross-examination, the witness testified that he was in this

room about two minutes altogether before the explosion occurred; that there was not a minute between the three times he gave the signal; that he was five or six feet away from Sparrow and ten or twelve feet away from the plaintiff; that Sparrow was seven or eight feet away from the plaintiff and on the other side of the pile; and that the witness was standing on the pile.

It appeared that immediately after the explosion the lantern was found in the pit at the bottom of the elevator well in one of the buckets; that it was upside down, and the chimney out of place; and that the wick was burning, but the lantern seemed to have no oil in it.

A witness called by the defendant testified that when the elevator was started at any time after being cleared out it would not start suddenly, but it started gradually.

There was evidence that when the signal was given to start the elevator the men on the top floor tried it by pulling on the belt with their hands to see if it was free to move, but that they were unable to do more than tighten the chain, and could not start the buckets moving. There was also evidence tending to show that the elevator could not have moved or started at the time of the accident on account of the condition of the pit about the lower drum and the material packed about the buckets. Except as above stated there was no evidence that the elevator did in fact start or move at the time of the accident. There was no evidence that a lantern had ever been used before in this place except when hung upon the nails above the floor.

It was admitted that Sparrow was a person intrusted with superintendence, whose sole or principal duty was that of superintendence, and there was no evidence that there was any other such person. At the close of the evidence, the defendant asked the judge to rule that the plaintiff could not recover, and to direct a verdict for the defendant; but the judge refused so to do.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

The case was argued at the bar in January, 1899, and afterwards was submitted on briefs to all the justices.

*H. E. Warner*, for the defendant.

*J. E. Hannigan*, for the plaintiff.

LATHROP, J.   The plaintiff's theory of this case is that while he was at work clearing with a shovel an elevator well, the machinery in which — an endless chain of buckets — had become clogged, and while he had between his feet a lantern, the defendant's superintendent, knowing the position of the lantern, gave directions without the plaintiff's knowledge to start the machinery in the well ; that the machinery generated a strong current of air in the vicinity ; that this current struck the lantern, and, as the air was charged with inflammable dust or powder arising from the material in process of manufacture, an explosion followed which caused the injury.

While the exceptions state that the material being fed into the elevator was like a fine powder or dust which covered the premises and machinery, and was inflammable, it does not appear that this fact was known to the superintendent or ought to have been known to him.   The material was made from bone, rock, and refuse from slaughter houses, and was ground to the consistency of flour or meal.   But while it is well known that wheat flour is inflammable, there is nothing in the evidence in this case to show that the product being manufactured at the time of the accident was known to be inflammable before the accident itself showed it to be so.   Nor do we find any evidence that the superintendent, if he knew that the plaintiff was working with a lantern, had knowledge that he had placed it between his feet.   The evidence shows that the pile of material was five or six feet high ; and that the plaintiff was working on one side and the superintendent was on the other side, about eight feet off.

If, however, it be assumed that the inflammability of the dust was a matter of common knowledge, it is difficult to see why the plaintiff did not know as much about it as any one.   He had been engaged in this work for three years, and must have known all that was to be ascertained from familiarity with the nature of the material and of the work.   See *Lyons* v. *Boston Towage & Lighterage Co.* 163 Mass. 158.

Without going further into the details of the case, a majority of the court is of opinion that the evidence is not sufficient to warrant the jury in finding the defendant liable ; and the request that a verdict be directed for the defendant should have been granted.                                        *Exceptions sustained.*